**Shirley LENOIR, Individually and as Personal Representative of the Estate of Shana Lenoir and Christopher McKnight, Individually and as Next Friend of Nayla McKnight, Appellants**

v.

**U.T. PHYSICIANS, Appellee**

**NO. 01–14–00767–CV**

Court of Appeals of Texas, Houston (1st Dist.).

Opinion issued March 29, 2016

Rehearing En Banc Overruled June 23, 2016

---

See also 439 S.W.3d 489 and 469 S.W.3d 669.

72

Joseph Michael Gourrier, The Gourrier Law Firm, LLP, Houston, for Appellants.

David R. Iler, Warren S. Huang, Jaqualine P. McMillan, Norton Rose Fulbright US LLP, Houston, Jason Warner, Asst. Atty. Gen., Austin, for Appellee.

## OPINION ON REHEARING [1]

Harvey Brown, Justice

This is a health care liability case arising from the death of Shana Lenoir hours after receiving prenatal care at U.T. Physicians clinic (UTP). UTP obtained dismiss-

---

1. U.T. Physicians filed a motion for rehearing of our opinion of July 7, 2015. We granted the motion for rehearing, held oral argument on the motion, and now withdraw our earlier opinion and judgment and issue the following in their stead. The disposition remains the same.

al from the suit when the trial court granted its plea to the jurisdiction based on an assertion that it qualifies as a governmental unit and, therefore, has governmental immunity from suit. The appellants (referred to collectively as the Lenoirs) brought this interlocutory appeal challenging the dismissal.

The Lenoirs contend that the trial court erred by granting UTP's plea to the jurisdiction because (1) UTP failed to prove that it is a governmental unit as defined by the Tort Claims Act (TCA) and (2) to the extent the TCA does apply, the Lenoirs adequately alleged that Shana's death was proximately caused by an employee's use of tangible physical property.

Because we conclude that UTP does not have governmental immunity from suit, we reverse the trial court's order granting UTP's plea to the jurisdiction and remand for further proceedings.

## Background

Shana Lenoir received prenatal care at UTP clinic. She was seen by Dr. Gonski—a second-year medical resident. Shana discussed with Dr. Gonski complications she had with an earlier twin pregnancy. The twins were born preterm. One died; the other required extensive medical care and was in the neonatal intensive care unit for several months. On this visit, Shana was between 32 and 35 weeks pregnant with twins. Dr. Gonski prescribed weekly injections of progesterone. A nurse employed by UTP clinic, Angela Matthews, gave Shana her initial progesterone injection during the office visit.

While at home several hours later, Shana began having difficulty breathing. She was taken by EMS to Memorial Hermann Hospital; however, she and both of her unborn children died before they arrived.

The Lenoirs sued the treating physician (Dr. Gonski), the attending physician overseeing Dr. Gonski (Dr. Huang), the UTP nurse who injected the progesterone (Matthews), and UTP clinic.[2] In related appeals, we have rendered judgment for Matthews, affirmed the dismissal of Dr. Huang, and reversed the dismissal of Dr. Gonski.[3] We now consider whether the trial court erred by dismissing UTP based on governmental immunity.

## The Lenoirs are not Barred by Judicial Admission

As an initial matter, UTP argues that the Lenoirs are prohibited from contesting its status as a governmental unit because they made judicial admissions when contesting the dismissal of UTP's nurse employee, Matthews.

### A. A judicial admission is an unequivocal assertion of fact

A judicial admission is an unequivocal assertion of fact that, once made, relieves the opposing party of its burden of proving the admitted fact and bars the admitting party from disputing that fact. See *Holy Cross Church of God in Christ v. Wolf* 44 S.W.3d 562, 568 (Tex.2001); *Houston First Am. Sav. v. Musick*, 650 S.W.2d 764, 767 (Tex.1983); *Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex.1980). A judicial admission must be "clear, deliberate, and unequivo-

---

**2.** Dr. Gonski contended that she worked for the UT Medical Foundation, and Dr. Huang contended that he worked for the UT Health Science Center at Houston (UTHSCH). The Lenoirs did not sue either of those entities.

**3.** *Matthews v. Lenoir*, 439 S.W.3d 489 (Tex. App.–Houston [1st Dist.] 2014, pet. denied); *Lenoir v. Marino*, 469 S.W.3d 669 (Tex.App.–Houston [1st Dist.] 2015, pet. filed Oct. 7, 2015) (op. on reh'g).

cal." *Regency Advantage Ltd. P'ship v. Bingo Idea–Watauga, Inc.*, 936 S.W.2d 275, 278 (Tex.1996).

▮ The elements for establishing that a statement is a judicial admission are

(1) the statement must be made in the course of a judicial proceeding;

(2) it must be contrary to an essential fact or defense asserted by the party;

(3) it must be deliberate, clear, and unequivocal;

(4) it cannot be destructive of the opposing party's theory of recovery or defense; and

(5) enforcing the statement as a judicial admission would be consistent with public policy.

*H2O Solutions, Ltd. v. PM Realty Grp., LP*, 438 S.W.3d 606, 617 (Tex.App.–Houston [1st Dist.] 2014, pet. denied); *Khan v. GBAK Props., Inc.*, 371 S.W.3d 347, 357 (Tex.App.–Houston [1st Dist.] 2012, no pet.). "An assertion of fact pleaded in the alternative is not a judicial admission." *H2O Solutions*, 438 S.W.3d at 617; *accord Wolf*, 44 S.W.3d at 568.

**B. The Lenoirs did not judicially admit that UTP is a governmental unit**

▮ UTP's original answer contained an assertion of governmental immunity. Consistent with that assertion, the Attorney General's Office began representing UTP. Subsequently, Matthews moved for dismissal, asserting that she had not been timely served with an expert report. In response, the Lenoirs argued that the AG's actual representation of the employer (UTP) alleged to be vicariously liable for the negligent acts of its employee (Matthews) mandated that the AG also represent the employee. Thus, the Lenoirs argued, timely service of the expert report on the AG's office counted as timely service on Matthews.

Nowhere in that argument is there a "deliberate, clear, and unequivocal" assertion of fact that UTP is a governmental unit. *See Regency Advantage Ltd. P'ship*, 936 S.W.2d at 278. Instead, the Lenoirs were arguing that, if the defendants were going to "allege" that they had governmental immunity, then they were going to be bound by the laws and rules that accompany that assertion, including that the AG's representation of the employer mandates that the AG also represent the employee. In other words, the defendants (including UTP and Matthews) could not purport to rely on governmental immunity to defeat the Lenoirs' claims while avoiding the effects of that assertion (AG representation and adequate service).

The Lenoirs took a consistent position in the *Matthews* appeal, arguing in their brief:

U.T. Physicians was represented by the Office of the Attorney General (OAG) because it alleged that it is a governmental unit in its answer. As such, the OAG is also the attorney for U.T. Physicians' former co-employee, Nurse Matthews.... Since U.T. Physicians alleges that it is a governmental unit of the State of Texas and Nurse Matthews was its former employee, the attorney general is her attorney in negligence actions arising from conduct in the course and scope of her employment or contractual performance.

. . . .

The Lenoirs have never argued that the OAG "automatically became Nurse Matthews' attorney simply upon filing of the lawsuit. Instead, the Lenoirs asserted that the OAG was already participating in the lawsuit as the attorneys of record for Nurse Matthews' vicariously liable co-employer, U.T. Physicians, an alleged governmental unit. Therefore, U.T.

Physicians must have requested legal representation from the OAG because the OAG filed an answer on behalf of U.T. Physicians, on July 20, 2012. Since the OAG was already representing U.T. Physicians based on the conduct of its co-employee, Nurse Matthews, the OAG was also responsible for providing legal representation to Nurse Matthews, even though she had not yet been served with process.

To the extent there is an "assertion of fact" in this argument, it concerns who was representing Matthews, not whether UTP is a governmental unit.

Likewise, the Lenoirs never admitted that UTP was a governmental unit in the pleadings underlying this appeal. The Lenoirs have consistently maintained that "UT Physicians is an independent contractor to UTHSCH and is not entitled to governmental immunity. Further, Defendant Angela Matthews is an employee of an independent contractor and her employer is not entitled to assert governmental immunity under the plain language of the statute."

Furthermore, AG representation was not the Lenoirs' only argument against dismissal of Matthews. They made two additional, *alternative* arguments: (1) Matthews failed to timely object to the Lenoirs' report and, therefore, waived all other challenges to the report and (2) the Lenoirs' diligence in attempting service on Matthews prevented dismissal on constitutional grounds.

In conclusion, the Lenoirs made alternative arguments why Matthews should not be dismissed from the suit. None of the three arguments were based on an unequivocal assertion that UTP qualifies as a governmental unit. We, therefore, conclude that no judicial admission was made. Accordingly, we reject UTP's argument that the Lenoirs are barred from challenging the grant of UTP's plea to the jurisdiction. We turn now to whether the trial court erred by granting UTP's plea to the jurisdiction on immunity grounds.

### Governmental Immunity from Suit

 UTP filed a plea to the jurisdiction, arguing that it is a governmental entity with immunity from suit. The doctrine of governmental immunity from suit bars litigation against the state and its governmental units unless the state consents by waiving its immunity. *Tex. Adjutant Gen.'s Office v. Ngakoue*, 408 S.W.3d 350, 353 (Tex.2013). The doctrine protects the state and its subdivisions from lawsuits that would "hamper governmental functions by requiring tax resources to be used for defending lawsuits and paying judgments rather than using those resources for their intended purposes." *Id.* (quoting *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 (Tex.2008)). A trial court lacks jurisdiction to hear a case against the government absent waiver of immunity from suit; therefore, whether immunity from suit exists presents a jurisdictional question. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224–25 (Tex.2004). This is in contrast to immunity from liability, which is an affirmative defense to liability, must be pleaded and proven by the movant, and does not present a jurisdictional question. *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex.2015); *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex.1999); *Austin Indep. Sch. Dist. v. Gutierrez*, 54 S.W.3d 860, 862 n. 3 (Tex.App.–Austin 2001, pet. denied).

 The judiciary determines the extent of governmental immunity, but the decision whether to waive that immunity is left solely to the Legislature. *See Miranda*, 133 S.W.3d at 226 (holding that courts must determine extent of immuni-

ty); *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 853 (Tex.2002) (holding that Legislature solely can waive immunity). Statutory waivers of immunity are construed narrowly. *Garcia*, 253 S.W.3d at 655; *see* Tex. Gov't Code Ann. § 311.034 (West 2013) (statutes are construed to waive sovereign immunity only if "by clear and unambiguous language"). The TCA provides a limited waiver for certain claims. Tex. Civ. Prac. & Rem. Code Ann. § 101.001–.109 (West 2011). For example, a governmental unit can be held liable for a death caused by use of tangible personal property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law. *Id.* § 101.021(2).

## A. Standard of review

A trial court must have subject-matter jurisdiction to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex.1993). A plaintiff bears the initial burden of alleging facts that affirmatively demonstrate the trial court's subject-matter jurisdiction over the suit. *Id.* at 446. A defendant may challenge the trial court's subject-matter jurisdiction through a plea to the jurisdiction. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex.2000).

The purpose of a plea to the jurisdiction is to "defeat a cause of action without regard to whether the claims asserted have merit." *Id.* It does not authorize a court to delve into the merits of the plaintiff's claims; instead, a court examines the preliminary issue of whether the merits of those claims should be reached. *Id.* Accordingly, in reviewing the trial court's ruling on a plea to the jurisdiction, we construe the pleadings liberally in favor of the plaintiffs and determine if the plaintiffs have alleged facts that affirmatively demonstrate the court's jurisdiction

to hear the cause. *Miranda*, 133 S.W.3d at 226; *Villarreal v. Harris Cty.*, 226 S.W.3d 537, 541 (Tex.App.–Houston [1st Dist.] 2006, no pet.).

If the pleadings lack sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not reveal incurable jurisdictional defects, the issue is one of pleading sufficiency, and the trial court may either afford the plaintiffs an opportunity to amend or await further development of the case. *Miranda*, 133 S.W.3d at 227; *Villarreal*, 226 S.W.3d at 541. Conversely, if the pleadings affirmatively negate the existence of jurisdiction, the trial court may grant the plea to the jurisdiction without providing the plaintiffs an opportunity to amend. *Miranda*, 133 S.W.3d at 227; *Villarreal*, 226 S.W.3d at 541.

If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider the parties' relevant evidence to resolve the jurisdictional issues raised. *Miranda*, 133 S.W.3d at 227; *Bland*, 34 S.W.3d at 555 (confining evidentiary review to evidence relevant to jurisdictional issue). If the relevant evidence is conclusive or fails to raise a fact question on the jurisdictional issue, the plea to the jurisdiction may be resolved as a matter of law. *See Miranda*, 133 S.W.3d at 228. Conclusive evidence includes "undisputed evidence that allows only one logical conclusion," evidence that is admitted to be true, and evidence conclusively disproven. *See City of Keller v. Wilson*, 168 S.W.3d 802, 814–17 (Tex.2005). If, instead, the evidence raises a fact question regarding the jurisdictional issue, the movant has failed to establish its right to dismissal. *See Miranda*, 133 S.W.3d at 227–28. This standard for pleas to the jurisdiction mirrors the review of summary judgments, and we therefore take as true all evidence favorable to the nonmovant plaintiffs, indulging every reasonable inference and re-

solving any doubts in their favor. *City of El Paso v. Heinrich,* 284 S.W.3d 366, 378 (Tex.2009).

## B. Jurisdictional facts do not conclusively establish that UTP is a governmental unit entitled to immunity

UTP is affiliated with the University of Texas System. The UT System includes the University of Texas Health Science Center at Houston (UTHSCH), which has immunity from suit. *See Univ. of Tex. Health Sci. Ctr. at Houston v. Dickerson,* No. 14–13–00232–CV, 2014 WL 708521, at *3 (Tex.App.–Houston [14th Dist.] Feb. 20, 2014, no pet.) (mem.op.). The UT Board of Regents authorized UTHSCH to establish a subsidiary entity, UTP. UTP operates a medical clinic at which UTHSCH teaching physicians provide medical care to patients and medical instruction to physicians in the UTHSCH residency programs. The UTP nurses and support staff are employees of UTP or outside staffing companies; they are not employed by UTHSCH.

The Lenoirs allege that a nurse employed solely by UTP or jointly between UTP and an outside staffing company acted negligently and that UTP is liable for its nurse's negligence. In response to UTP's immunity argument, the Lenoirs argue that UTP is a private entity with no immunity. Alternatively, the Lenoirs argue that, if UTP has immunity, that immunity has been waived under the TCA.

UTP obtained dismissal on the basis that it qualifies as a "governmental unit" entitled to assert immunity from suit. Section 101.001(3) of the Tort Claims Act states a four-part definition of "governmental unit" relevant to waiver of govern-

mental immunity. UTP relies on two parts of the definition in its immunity assertion.[4] The first is Subsection (D), which looks to the source of the entity's authority and includes within the definition

> any other institution, agency, or organ of government the status and authority of which are derived from the Constitution of Texas or from laws passed by the legislature under the constitution.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(3)(D). The second is Subsection (A), which defines a "governmental unit" as

> this state and all the several agencies of government that collectively constitute the government of this state, including other agencies bearing different designations, and all departments, bureaus, boards, commissions, offices, agencies, councils, and courts[.]

*Id.* § 101.001(3)(A). We consider first the Subsection (D) basis.

### 1. "Governmental unit" status under Subsection (D)

To meet Subsection (D)'s requirements, the entity asserting immunity from suit must have a legislative or constitutional source from which it derived its status and authority. *LTTS Charter Sch., Inc. v. C2 Constr., Inc.,* 342 S.W.3d 73, 76, 81 (Tex. 2011).

■■■ UTP contends that it derived its status and authority from various Education Code provisions. Section 65.11 of the Education Code charges the UT Board with the "administration" and "organization" of the UT System institutions and entities to "achieve the maximum operating efficiency of such institutions and entities." TEX. EDUC. CODE ANN. § 65.11 (West

---

4. We limit our analysis to the bases raised in UTP's plea. UTP relies on these same two bases in its appellate briefing.

2002). Section 65.31(g) allows the UT Board "by rule [to] delegate a power or duty of the board to a committee, officer, employee, or other agent of the board." *Id.* § 65.31(g). Section 65.31(a) provides that the UT Board of Regents "is authorized and directed to govern, operate, support, and maintain each of the component institutions that are now or may hereafter be included in a part of The University of Texas System." *Id.* § 65.31(a).

Section 65.02 specifically lists 12 entities that comprise the UT System. *Id.* § 65.02. It further lists 29 subordinate entities that are included within the 12 main entities. *Id.* The statute specifically identifies UTHSCH and lists within it the UT Houston Medical School, Dental Branch, Graduate School of Biomedical Sciences, School of Health Information Sciences, School of Public Health, Speech and Hearing Institute, and School of Nursing. *Id.* The list does not include UTP. *See id.* Subsection (b) provides that "The University of Texas System shall also be composed of such other institutions and entities as from time to time may be *assigned by specific legislative act* to the governance, control, jurisdiction, or management of The University of Texas System." *Id.* § 65.02(b) (emphasis added). Similarly, Section 73.001(7) states that the University of Texas Houston is composed of six specific component institutions (none of which is UTP) and "other institutions and activities assigned to it from time to time." *Id.* § 73.001.

While these provisions grant the UT Board legislative authority to organize, manage, and operate its component parts, the Legislature explicitly reserved to itself authority to add entities to the UT System. *See* TEX. EDUC. CODE ANN. §§ 65.02(b), 73.001. Consistent with the requirement of legislative authorization, the Amarillo court of appeals has held that

an entity cannot incorporate itself into the UT System "by custom and usage or at the behest of a single university officer." *Univ. Interscholastic League v. Payne,* 635 S.W.2d 754, 757 (Tex.App.–Amarillo 1982, writ dism'd) (holding that UIL failed to establish that it qualified as governmental entity in its own right or as part of UT—Austin, even though UIL was created at urging of UT—Austin president). Only if the Legislature specifically addresses the existence and status of an entity will Subpart (D)'s requirements for classification as a "governmental unit" be met. *See Univ. Interscholastic League v. Sw. Officials Ass'n, Inc.,* 319 S.W.3d 952, 958 (Tex.App.–Austin 2010, no pet.) (noting post–*Payne* amendment to Education Code declaring that UIL "is a part of" UT—Austin and holding that statutory language met requirement for UIL to be considered governmental unit for governmental immunity purposes).

UTP also points to the minutes of a UT Board of Regents meeting memorializing the Board's decision to permit UTHSCH and other health science centers to create certified nonprofit health corporations, like UTP. But authority from a state agency does not equate to legislative authority and cannot bring UTP within the "government unit" definition in Section 101.001(3)(D). This distinction is made clear in *LTTS Charter School.* 342 S.W.3d at 81.

In that governmental immunity case, the dissent took the position that an open-enrollment charter school lacked "governmental unit" status because its status and authority were "derived from" the State Board of Education, from which the schools obtain their charters. *See id.* at 84 (Guzman, J., dissenting). The majority opinion held otherwise, stating that the "dispositive issue is not who grants a charter but who grants a charter *meaning*." *Id.* at 81. The Court discussed multiple

Education Code provisions discussing the "power," "status," and "authority" of open-enrollment charter schools, *id.* at 76–77, 81, and concluded that, notwithstanding the Legislature's decision to task state agencies with managing the schools' day-to-day oversight, it was the Legislature, itself, that pronounced the "all-encompassing legislative regime that called charter schools into existence and that defines their role in our public-education system." *Id.* at 81. As the Court explained,

> The Legislature's own pronouncements declare the status and authority of open-enrollment charter schools. Other state entities and officials may exercise a measure of oversight pursuant to those statutory commands, but the commands themselves, and that they are legislative, are what matter most.

*Id.* at 82; *see Arbor E & T, LLC v. Lower Rio Grande Valley Workforce Dev. Bd., Inc.,* 476 S.W.3d 25, 32 (Tex.App.–Corpus Christi 2013, no pet.) (holding that local workforce development boards are governmental units after considering multiple statutory provisions discussing their "status" and "authority"); *cf.* TEX. HEALTH & SAFETY CODE ANN. § 262.001–.028 (West 2010) (provision of Hospital Authority Act, through which municipalities are authorized to create hospital authorities and those hospital authorities are statutorily granted various powers).

We also find instructive the holding of the San Antonio court of appeals that the city's water system did not qualify as a governmental unit under the TCA. *See San Antonio Water Sys. v. Smith,* 451 S.W.3d 442, 450–51 (Tex.App.–San Antonio 2014, no pet.). The water system claimed that it was a "governmental unit" and, as such, was entitled to dismissal from suit because the plaintiff failed to give it timely pre-suit claim notice. *Id.* at 445–46. The court analyzed the Texas Constitution and various Government Code provisions related to water systems and held that authority to operate a water system had been granted by the Legislature to municipalities, not the water systems directly. *Id.* at 450. The court explained:

> The Texas Constitution and statutes authorize home-rule *municipalities* to own their water systems. The statutes authorize home-rule *municipalities* to encumber the system assets and create dedicated funds for operating the system, and authorize *municipalities* to place management of the system in the hands of a board of trustees. However, neither the Texas Constitution nor any statute purports to confer any status or authority on such boards or systems. Instead, the legislature has expressly provided that the proceedings of the *municipality* are to specify the powers and duties of the board of trustees and the manner of exercising those powers and duties.

*Id.* Thus, the Legislature did not grant status or authority directly to the water system; water systems, including the San Antonio Water System, was created by city ordinance after the Legislature authorized cities to own them. The court concluded that the San Antonio Water System is not a "governmental unit," as that term is defined by statute, but is, instead, an "agency" or "department" of another governmental entity: the City of San Antonio. *Id.* at 450–51. As such, the San Antonio Water System was not entitled to notice of claim apart from that given to the City. *Id.* at 451–52.

We conclude that UTP does not qualify as a "governmental unit" under Subsection (D) because it received its power and authority from UTHSCH, as authorized by the UT Board, and not from a legislative or constitutional source.

### 2. "Governmental unit" status under Subsection (A)

■ UTP also argues that it is a "governmental unit" under Subsection (A), which includes within that definition "agencies of government that collectively constitute the government of this state, including ... all departments, bureaus, boards, commissions, offices, agencies, councils, and courts." TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(3)(A). UTP argues that it is an agency of the state because it "is a component unit of the U.T. System that was created pursuant to the authority granted to the U.T. System's Board of Regents by the Legislature." In support of that statement, UTP relies on *TRST Corpus, Inc. v. Financial Center, Inc.*, 9 S.W.3d 316 (Tex.App.–Houston [14th Dist.] 1999, pet. denied). As UTP describes the case, TRST qualified as a "governmental unit" because it was a wholly-owned subsidiary that was formed and is entirely controlled by a governmental unit and the lawsuit implicated the principal governmental unit's assets. Consistent with that view, UTP maintains that the determinative factors in the LAST holding were TRST's status as a wholly-owned and controlled subsidiary and its possession of state assets.

*TRST* involved a state agency, the Texas Retirement System of Texas, which created a subsidiary entity, TRST Corpus, Inc., to hold title to a single asset. *Id.* at 319. A third party filed a declaratory judgment action against TRST. *Id.* at 320. TRST filed a plea to the jurisdiction, asserting immunity from suit. *Id.* The Fourteenth Court of Appeals considered the relationship between TRS (the state agency) and TRST (its agent), specifically noting the following:

— TRS formed TRST as a title-holding subsidiary corporation;

— TRS is the sole shareholder of all TRST stock;

— TRST's "sole purpose is to hold title to a multi-million-dollar asset for the benefit of the TRS members"; and

— TRST is "owned and entirely controlled by TRS."

*Id.* at 321. Therefore, "a lawsuit that may implicate TRST's assets necessarily implicates the TRS's assets. Consequently, a lawsuit against TRST is also a lawsuit against the TRS, a state agency. To the extent that TRS may assert sovereign immunity against [the plaintiff's] lawsuit, TRST may likewise assert sovereign immunity." *Id.* In support of its holding, the court cited *K.D.F. v. Rex*, 878 S.W.2d 589 (Tex.1994). But *K.D.F.* did not concern a state entity's wholly-owned subsidiary and did not extend immunity of the basis of that status. *Id.* at 590.

In *K.D.F.*, the Texas Supreme Court applied the concept of comity between states and held that K.D.F.—a Kansas general partnership created by a private Kansas bank to hold a state agency's assets—could benefit from Kansas's sovereignty. *Id.* at 597. The Court reasoned that Kansas would have been "indirectly" liable for K.D.F.'s acts in a manner analogous to state vicarious liability for ministerial acts of an employee or agent. *Id.*

The common factor in *TRST* and *K.D.F.* (on which *TRST* relied) was not status as a wholly-owned subsidiary, but, instead, the two entities' roles as asset-holding agents serving ministerial functions, without discretion, for their principals.[5] Accordingly,

---

5. In *K.D.F. v. Rex,* there were two entities asserting a right to immunity held by the Kansas Public Employees' Retirement System (KPERS). One was K.D.F., a Kansas general partnership created by a private bank to hold securities for KPERS. 878 S.W.2d 589, 591

we do not view UTP's status as a wholly-owned subsidiary as determinative. Furthermore, UTP is not an asset holding company. It is a functioning medical clinic where physicians (employed by UTHSCH) come together with nurses, clinical personnel and others (employed by UTP, third-party staffing companies, or jointly between them) to provide medical care to the public. In a clinical setting, all involved make decisions, interact with patients, and are engaged in various and sometimes distinct aspects of the patients' care. We do not view the activities in such a dynamic environment to be equivalent to the concept of a holding company that has no independent discretion: the two are not analogous. As such, neither *TRST* nor *K.D.F.* support extending immunity to the UTP clinic.

Moreover, applying UTHSCH's immunity to UTP would be contrary to the Legislature's directive that only it may add entities to the UT System and, by extension, to its immunity protections. *See* Tex. Educ. Code Ann. § 65.02(b) ("The University of Texas System shall also be composed of such other institutions and entities as from time to time may be *assigned*

*by specific legislative act ....*" (emphasis added)); *id.* § 73.001(7) (stating that The University of Texas at Houston is composed of only six named component institutions, plus "other institutions and activities assigned to it from time to time."). The UT System and its legislatively recognized additions are governmental units that may assert immunity; however, mere status as a wholly-owned subsidiary, in the context of these legislative enactments, does not shield UTP with another entity's immunity from suit.

To the extent the trial court granted UTP's plea to the jurisdiction based on UTP's assertion that it qualifies as a "governmental unit" under Subsections (A) or (D), the trial court's order was in error.

### UTP's alternative assertion that it may share in UTHSCH's immunity from suit

In its original plea to the jurisdiction and its appellate brief, UTP cited to two cases involving agents of governmental entities—*TRST*, 9 S.W.3d 316 and *Zacharie v. City of San Antonio*, 952 S.W.2d 56 (Tex.App.–San Antonio 1997, no pet.)—in

(Tex.1994). The suit arose after the governmental entity, KPERS, made a loan to a third party, which executed a promissory note payable to K.D.F., as KPERS's agent. *Id.*

The Court analogized the extension of KPERS's immunity to cover K.D.F. to the analysis employed to determine whether a state is liable for the acts of its employees. *See id.* at 597. The Court concluded that, under Kansas and Texas law, the state will be liable for the performance of ministerial functions by state employees acting under the state's control or direction but not for discretionary acts of employees (which might raise official immunity), acts of independent contractors, or intentional, grossly negligent, fraudulent, or malicious conduct by employees. *Id.* It then held that KPERS is entitled to sovereign immunity and KPERS's agent, K.D.F., "can benefit 'indirectly' from" that immunity. *Id.* This led to the Court's state-

ment that, because K.D.F. "operates solely upon the direction of KPERS, and exercises no discretion in its activities," for "jurisdictional purposes," KPERS and its agent, K.D.F., "are not distinguishable from one another; a lawsuit against one is a lawsuit against the other." *Id.*

Because none of the parties in *K.D.F.* were wholly-owned subsidiary of KPERS, the relationship between these entities did not provide a basis for the *TRST* holding. *See id.* at 591. Instead, and contrary to UTP's view of these cases, the relevant inquiry was the extent to which the entity seeking the benefit of immunity was performing ministerial acts without discretion with regard to holding state assets. *Id.* at 596–97; *TRST*, 9 S.W.3d at 321 (including parenthetical explanation of *K.D.F.* holding). That inquiry does not lead to the conclusion that immunity extends to the UTP clinic.

support of its argument that it meets the definition of a "government unit" and, as such, may assert immunity from suit. UTP did not argue that it was entitled to share in UTHSCH's immunity from suit.

On motion for rehearing, UTP takes the position that it is an agent or wholly-owned subsidiary of UTHSCH, created by UTHSCH, and, as a result, is entitled to the same immunity that it possesses. Before we explain why UTHSCH's immunity cannot reach out to cover UTP as an agent or subsidiary, we first review the underlying justifications for recognizing the immunity of a governmental entity and for expanding that immunity to others.

## A. Justifications for governmental immunity

The doctrine of sovereign immunity, also known as governmental immunity, bars suits against the state and its governmental units unless the state consents by waiving immunity. *Brown & Gay*, 461 S.W.3d at 121; *Ngakoue*, 408 S.W.3d at 353. Modern-day justifications for governmental immunity "revolve around protecting the public treasury ... 'from lawsuits for money damages' and other forms of relief, and leaves to the Legislature the determination of when to allow tax resources to be shifted 'away from their intended purpose towards defending lawsuits and paying judgments.'" *Brown & Gay*, 461 S.W.3d at 121 (quoting *IT–Davy*, 74 S.W.3d at 853–54); *see also Ngakoue*, 408 S.W.3d at 353 (sovereign immunity protects state from lawsuits and liability that would otherwise "hamper governmental functions by requiring tax resources to be used for defending lawsuits and paying judgments rather than using those resources for their intended purposes." (quoting *Garcia*, 253 S.W.3d at 655)).

Sovereign immunity benefits the public "by preventing potential disruptions of key government services that could occur when government funds are unexpectedly and substantially diverted by litigation," but it does so at the expense of "injured individuals" who, when sovereign immunity applies, must singularly bear the costs and consequences of the improvident governmental actions that led to their injuries. *Brown & Gay*, 461 S.W.3d at 121; *see Bacon v. Tex. Historical Comm'n*, 411 S.W.3d 161, 172 (Tex.App.–Austin 2013, no pet.) (noting that "sovereign immunity generally shields our state government's improvident acts" even when they are "harsh" or "unjust"). This, the Texas Supreme Court has explained, is not an effort "to avoid any and all increases in public expenditures" but to protect against an "unforeseen" "diversion" of state funds "previously earmarked for another purpose." *Brown & Gay*, 461 S.W.3d at 123–24.

## B. Expansion of immunity to others

The judiciary has, at times, extended governmental immunity to shield additional actors beyond the state and its political subdivisions. *Brown & Gay* analyzed this history and what is required for a private entity to benefit from sovereign immunity. *Id.* at 123–27. The Court held that a private entity contracting with the government may benefit from sovereign immunity if "it can demonstrate its actions were actions of the ... government" and that "it exercise[d] no discretion in its activities." *Id.* at 124–25 (quoting *K.D.F.*, 878 S.W.2d at 597).

In *Brown & Gay*, a private engineering firm contracted with a governmental unit, the Fort Bend County Toll Road Authority, to design and construct a toll roadway. *Id.* at 119. The governmental unit and the engineering firm were sued for failing to design proper signage that, the plaintiffs claimed, would have prevented a drunk

driver from entering an exit ramp and causing a car accident. *Id.* at 119–20. After the governmental unit successfully asserted its immunity defense, Brown & Gay filed its own plea to the jurisdiction, "arguing that it was an employee of the Authority being sued in its official capacity and was therefore entitled to governmental immunity." *Id.* at 120. Although the trial court granted the plea, the court of appeals reversed, holding that Brown & Gay was an independent contractor, not an employee. *Id.*

On appeal to the Texas Supreme Court, Brown & Gay pivoted its argument, admitting its independent-contractor status but arguing "its status ... does not foreclose its entitlement to the same immunity afforded to the Authority." *Id.* The Court explained the argument as follows: "a private company that performed allegedly negligent acts in carrying out a contract with a governmental unit seeks to invoke the same immunity that the government itself enjoys." *Id.* at 122.

The Court noted that the Authority had delegated to Brown & Gay the responsibility of designing the toll road's signs and traffic layout and furnishing the necessary equipment and personnel to perform its contractual duties. *Id.* at 119–120. It also required Brown & Gay to maintain liability insurance. *Id.* at 119–120, 123. The plaintiffs' claims included allegations that Brown & Gay had discretion to create and

position warning signs but implemented this task in a negligent manner.

Like the Fourteenth Court of Appeals in *TRST,* the *Brown & Gay* Court found instructive its earlier *K.D.F.* opinion, in which it stated that a government agent is entitled to immunity if it can demonstrate that "its actions were actions of the [governmental entity], executed subject to the control of [the governmental entity]." *Id.* at 124 (quoting *K.D.F.,* 878 S.W.2d at 597). The Court considered the lack of discretion in *K.D.F.* and stated that immunity extended there because "the complained-of conduct ... was effectively attributed to the government." 461 S.W.3d at 125. In other words, immunity extends when "the alleged cause of the injury was not the independent action of the contractor, but the action taken by the government *through* the contractor." *Id.; see also id.* at 129 ("An independent contractor may act *as* the government, in effect becoming the government for limited purposes, and when it does, it should be entitled to the government's immunity.") (Hecht, C.J., concurring).

The *Brown & Gay* Court examined whether the government had the "right to control" the particular traffic-control decisions in question, recognizing that "private parties exercising independent discretion are not entitled to sovereign immunity." *Id.* at 124, 126.[6] The discretion granted to

---

6. The Court cautioned that it was not addressing "whether some degree of control by the government" would extend immunity, holding "only that no control is determinative." *Brown & Gay Eng'g, Inc. v. Olivares,* 461 S.W.3d 117, 126 (Tex.2015). Chief Justice Hecht clarified the point of analysis:

In determining whether an independent contractor is acting *as* or only *for* the government, the extent of the government's control over the independent contractor's actions is relevant but not conclusive.... [I]mmunity from suit may depend, not on a

governmental entity's control over the contractor's work, but rather over whether the suit complains of the very existence of a project, a governmental decision, as opposed to the contractor's performance.

A contractor ... is liable for negligent performance ... but insofar as it is simply implementing the government's decisions it is entitled to the government's immunity. An independent contractor's authority or even agency to serve the government are also relevant, but the ultimate issue is whether the independent contractor is actu-

the contractor regarding *"how* to do the work" of placing signage "separated it from the [government] and thus from the [government's] immunity." *Id.* at 131 (Hecht, C.J., concurring).[7]

The Court also noted the fiscal rationale for extending immunity to contractors and concluded that it loses force the more that litigation expenses are removed from real-time government budget allocation considerations. *Id.* at 123–24. When a private entity contracts with the government to perform services and the private entity maintains insurance to cover litigation and judgment costs, there is a diminished threat that litigation-driven "costs and consequences" will be borne by the government because the government is not facing unplanned and unforeseen costs that might force budgetary reallocations. *See id.* at 121, 124; *but see id.* at 131 (Hecht, J.,

> ally authorized by the government to act in its place.
> *Id.* at 130.

**7.** The Court in *Brown & Gay* found instructive the following explanation of the rationale for limiting derivative immunity:

> Where the government hires a contractor ... and specifies the manner in which the task is to be performed, and the contractor is later haled into court to answer for a harm that was caused by the contractor's compliance with the government's specifications, the contractor is entitled to the same immunity the government would enjoy, because the contractor is, under those circumstances, effectively acting as an organ of government, without independent discretion. Where, however, the contractor ... is allowed to exercise discretion in determining how the task should be accomplished, if the manner of performing the task ultimately causes actionable harm to a third party the contractor is not entitled to derivative sovereign immunity, because the harm can be traced, not to the government's actions or decisions, but to the contractor's independent decision to perform the task in an unsafe manner. Similarly, where the contractor is hired to perform the task according to precise specifications

concurring) (stating opposite view regarding fiscal relevance).

Based on the Brown & Gay contractor's discretion, the allegations of independent negligence[8] in the exercise of that discretion, and the contractor's procurement of insurance (to avoid making the government subject to unforeseen litigation costs), the Court held that the contractor was not entitled to sovereign immunity:

> In sum, we cannot adopt Brown & Gay's contention that it is entitled to share in the Authority's sovereign immunity solely because the Authority ... would have been immune had it performed those services itself. That is, we decline to extend to private entities the same immunity the government enjoys for reasons unrelated to the rationale that justifies such immunity in the first place.

> but fails to comply with those specifications, and the contractor's deviation from the government specifications actionably harms a third party, the contractor is not entitled to immunity because ... the harm was not caused by the government's insistence on a specified manner of performance but rather by the contractor's failure to act in accordance with the government's directives.
> 461 S.W.3d at 125 n. 9 (quoting *Bixby v. KBR, Inc.,* 748 F.Supp.2d 1224, 1242 (D.Or.2010)).

**8.** Courts sometimes state that an agent of a governmental entity is not entitled to derivative immunity when it was "independently negligent." *See, e.g., Rodriguez v. New Jersey Sports & Exposition Auth.,* 193 N.J.Super. 39, 472 A.2d 146, 149 (1983); *Ackerson v. Bean Dredging LLC.,* 589 F.3d 196 (5th Cir.2009) (holding that district court correctly dismissed claims against contractor when plaintiff did not allege that contractor committed "any separate act of negligence"); *Contango Operators, Inc. v. U.S.,* 965 F.Supp.2d 791, 814 (S.D.Tex.2013); *see Swilling v. Knight,* 205 S.W.2d 421, 422 (Tex.Civ.App.–Texarkana 1947, no writ) (government contractor is not liable if contractor's negligence "consists in the method adopted under the direction of the city authorities....").

[This] suit does not threaten allocated government funds and does not seek to hold Brown & Gay liable merely for following the government's directions. Brown & Gay is responsible for its own negligence as a cost of doing business and may (and did) insure against that risk, just as it would had it contracted with a private owner.

*Id.* at 127.[9]

Relying on *Brown & Gay*, the Corpus Christi Court of Appeals recently noted that, under the doctrine of derivative sovereign immunity, common-law agents are entitled to share in their sovereign-principal's immunity, in some circumstances, but not when their own discretionary acts are the basis of the plaintiff's claims. *Freeman v. Am. K–9 Detection Servs., L.L.C.*, No. 13–14–00726–CV, —— S.W.3d ——, ——, 2015 WL 6652372, at *7 (Tex.App.–Corpus Christi Oct. 29, 2015, pet. filed); *see also McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1343 (11th Cir. 2007) ("a common law agent may sometimes share in the [government's] sovereign immunity ..." *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir.2000) ("common law agents acting within the scope of their employment for the United States have derivative sovereign immunity" when their acts amount "to the act[s] of the government").

In *Freeman*, a military contractor claimed derivative immunity in a suit involving a trained military dog that allegedly attacked the plaintiff —— S.W.3d at ——, 2015 WL 6652372, at *1. She alleged that the dog-handler defendants failed to properly train the dog to not attack without cause and an attack command. *Id.* at ——, 2015 WL 6652372, at *7. The court of appeals held that the contractor could not shield itself under a theory of derivative sovereign immunity because the allegations were that the contractor failed to follow the performance-based contract, failed to adequately train the dog, and demonstrated independent negligence. *Id.* at ——, 2015 WL 6652372, at *10. Thus, the discretion afforded the contractor and the negligence with which the contractor exercised that discretion left it without immunity.

In another case, the San Antonio Court of Appeals found determinative the large amount of discretion exercised by a construction contractor that was seeking immunity, stating that "courts should be 'careful not to extend the blanket of sovereign immunity to every entity which at first blush exhibits the characteristics of a governmental unit.'" *Bay, Inc. v. Ramos*, 139 S.W.3d 322, 328 (Tex.App.–San Antonio 2004, pet. denied) (quoting *Alamo*

---

**9.** The analysis was similar in an out-of-state case involving government services. *See Rodriguez*, 472 A.2d at 149. There, a plaintiff was robbed and assaulted while leaving the parking lot of a race track owned and operated by a government sporting authority. *Id.* at 147. The plaintiff sued the Authority and the private security company it contracted to provide security on the premises, Pinkerton's. *Id.* The plaintiff alleged that the defendants failed to provide proper security and lighting. *Id.* at 149 The court distinguished between claims arising out of a government's determination of policy and claims based on a contractor's *implementation* of the policy:

It is a well-settled general principle that one who contracts with a public body for the performance of public work, if not guilty of negligence or willful tort ... is entitled to share the immunity of the public body.... A public contractor may ... be held liable when negligent in the execution of the contract. However, plaintiffs have failed to show that Pinkerton's was independently negligent.... [A]ll policy decisions regarding the security function ... rested solely with the Authority.

*Id.* Without any evidence that Pinkerton's deviated from the Authority's direction in security placement and use, the court held that Pinkerton's was immune. *Id.* at 150.

*Workforce Dev., Inc. v. Vann*, 21 S.W.3d 428, 433 (Tex.App.–San Antonio 2000, no pet.)). "Because Bay's own activities involved considerable discretion, it had control over the [placement of barricades at the road construction site where a car accident occurred]. Accordingly, Bay was not entitled to either sovereign or official immunity." *Id.*

■ Thus, when courts have considered whether a private entity should share in the government's immunity, the primary consideration has been whether the contractor or agent was acting *as* the government without discretion. *Brown & Gay*, 461 S.W.3d at 125–26. If the contractor or agent lacked discretion, its actions were the actions of the governmental unit; if it had discretion, then it may be sued like any other private actor for its negligent exercise of that discretion. *Id.* at 125 n. 9.

C. **Does a governmental entity's immunity automatically extend to any agent it creates?**

■ According to UTP, "[u]nder longstanding agency principles," it can "step into the shoes of UTHSCH" to assert its immunity. UTP's contention is contrary to the *Brown & Gay* holding: not all agents are entitled to derivative immunity, and agents that exercise discretion are liable for their own negligence. *See* 461 S.W.3d at 121, 124.

The contract between UTHSCH and UTP extended discretion to UTP. It specifies that UTP shall provide UTHSCH with medical offices and all business and clinical supplies as well as "the non-physician personnel reasonably necessary for [UTHSCH]'s practice at the [medical office]." This personnel includes the nursing staff, which UTP was charged with managing, including the nurse alleged to have acted negligently in this case:

[UTP] shall provide all nursing and clinical personnel reasonably necessary for [UTHSCH]'s practice at the Offices. [UTP] has the sole and exclusive responsibility for determining and providing the compensation of such personnel. [UTP] also has the sole and exclusive right to hire and fire such personnel; provided, that [UTP] grants [UTHSCH] the right to approve, based solely on medical competence, all nurses and other clinical personnel and will, at [UTHSCH]'s request, remove and replace such personnel from time-to-time who are not, in [UTHSCH]'s medical judgment, adequately performing their professional services. In addition, [UTP] shall procure and maintain for its nursing and/or clinical personnel or shall ensure that its nursing and/or clinical personnel procures and maintains professional liability insurance in amounts acceptable to the [UTHSCH] throughout the term of this Agreement.

The contract evinces UTP's right to direct the nursing staff, control its compensation, and insure against professional liability for its acts. In doing so, UTP was granted discretion. It acted *for* the government—assisting it in its provision of medical services and education—not *as* the government without discretion or diversion. *Cf. K.D.F.*, 878 S.W.2d at 597 ("While sovereign immunity protects the activities of government entities, no sovereign is entitled to extend that protection *ad infinitum* through nothing more than private contracts."). As such, immunity does not extend. *Brown & Gay*, 461 S.W.3d at 124–25 & n. 9, 126.

UTP looks to an earlier, *pre-Brown & Gay* group of municipal water system cases to contend that simply being an agent created by a city, or, in its case, UTHSCH, extends immunity regardless of discretion. *See, e.g., Zacharie v. City of*

*San Antonio,* 952 S.W.2d 56 (Tex.App.–San Antonio 1997, no writ); *San Antonio Water System v. Smith,* 451 S.W.3d at 442. According to UTP, under these cases, if a governmental entity creates an agent, the agent may assert immunity regardless of the level of discretion exercised in its performance. We disagree.

These earlier cases establish that a municipality may delegate authority to its agent, a water system, only to the extent permitted by the applicable statute. *See Smith,* 451 S.W.3d at 449–50; *Zacharie,* 952 S.W.2d at 58; *see also* Tex. Atty. Gen. Op. DM–444, 1997 WL 419084 (July 18, 1997). Correspondingly, the water system is the city's agent, but only to the extent it acts within the powers and duties authorized. *See Smith,* 451 S.W.3d at 449–50; *Zacharie,* 952 S.W.2d at 58 ("Because article 1115 gives cities the power to create boards to manage and control their water systems, court have held that such boards, within their limited field of operation, are agents of that city."). As long as a city's grant of power to its water system stayed within what was legislatively authorized, the water system, as the city's agent, could exercise broad discretion. *See Smith,* 451 S.W.3d at 449–50. And, while exercising that discretion within the defined powers and duties, "the Water System, as an agent of the City, [i]s entitled to governmental immunity under the Texas Tort Claims Act." *Zacharie,* 952 S.W.2d at 59.

Here, the Legislature explicitly limited the reach of the UT System to those entities expressly enumerated and any additional entities "as from time to time may be assigned by specific legislative act to the governance, control, jurisdiction, or management of The University of Texas System." Tex. Educ. Code Ann. § 65.02(b); *see id.* § 73.001. The Legislature has not chosen to include UTP within the UT System structure. This contrasts with the legislation repeatedly referenced in *Zacharie* and other water system cases empowering municipalities to create water systems and transfer management and control of the water systems to boards with broad discretion. *See Zacharie,* 952 S.W.2d at 58–59; *Smith,* 451 S.W.3d at 447–50. This argues against UTP's position that UT's internal decision to create and empower UTP extends governmental immunity to it.

Further, the underlying rationale for extending immunity is absent here, just as it was in *Brown & Gay.* UTP argues that fiscal considerations support the expansion of immunity to it because "a lawsuit implicating [its] assets would implicate the U.T. System's assets." This assertion is based on the UTP Articles of Incorporation provision that states, in the event of its dissolution, UTP's assets will go to the UT System Board of Regents. We disagree that this provision demonstrates the same fiscal concerns discussed in *Brown & Gay.* There, the Court discussed unplanned and "unforeseen" litigation costs that could force real-time budgetary reallocations and the associated risk of disrupting government services. *See Brown & Gay,* 461 S.W.3d at 123. When there is no concern that the state will be required to divert funds in the face of litigation, the fiscal rationale for immunity is not implicated. *See id.* The mere possibility that UTP might one day cease to exist and, as a result, its assets transferred to the control of the UT Board implies no imminent fiscal threat from litigation. Moreover, UTP was required to insure against nursing staff professional liability, which further minimizes any impact litigation alleging nursing-staff negligence might have on the state budget.

We conclude that UTP's status as an agent created by UTHSCH does not extend immunity to it for discretionary acts

that form the basis for the plaintiff s nursing negligence claims. We turn, next, to UTP's argument that immunity extends to it as a wholly-owned subsidiary under the substantial control of its principal, UTHSCH.

### D. Does immunity extend to wholly-owned subsidiaries over whom a governmental entity exerts substantial control?

■ According to UTP, "the only legally relevant analysis in determining [UTP's] entitlement to sovereign immunity as a wholly-owned subsidiary of UTHSCH is whether UTHSCH exerts control over [UTP] itself." UTP maintains that "UTHSCH exerts direct and substantial control" over it because UTHSCH created UTP, chose its board of directors, retains sole authority to amend or repeal its Articles of Incorporation and Bylaws, and, should UTP cease to exist, would recover UTP's assets because the assets are to be directed to the UT System generally, of which UTHSCH is a component entity. UTP attempts to distinguish *Brown & Gay*, arguing that, there, the Texas Supreme Court held only that "no control" by the government entity meant that immunity would not extend, leaving open the possibility that some control would permit the extension of immunity.

For several reasons, we reject UTP's contention that it is under the substantial control of UTHSCH and its status as a wholly-owned subsidiary affords it immunity. First, the issue is whether the entity that is seeking to benefit from another's immunity had discretion as it relates to the activities underlying the plaintiff's claims. *See Brown & Gay*, 461 S.W.3d at 125–26 & n. 9. Just because UTHSCH retains the power to dismantle UTP does not also mean that UTHSCH has withheld all discretion from UTP in its operations or,

more specifically, in the management of UTP's nursing staff. As we have discussed, the contract between UTHSCH and UTP grants UTP discretion in the management of the nursing staff.

■ Second, UTP's argument that immunity extends to subsidiaries ignores the legal distinction between parent and subsidiary entities:

In Texas, for the purposes of legal proceedings, subsidiary corporations and parent corporations are separate and distinct "persons" as a matter of law; the separate entity of corporations will be observed by the courts even in instances where one may dominate or control, or may even treat it as a mere department, instrumentality, or agency of the other.

*Valero S. Tex. Processing Co. v. Starr Cty. Appraisal Dist.*, 954 S.W.2d 863, 866 (Tex. App.–San Antonio 1997, pet. denied); cf. *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 643 (3d Cir.1991) ("[T]here is a presumption that a corporation, even when it is a wholly owned subsidiary of another, is a separate entity."). This is true even in the context of assertion of immunity. *See Sims v. W. Waste Indus.*, 918 S.W.2d 682, 686 (Tex.App.–Beaumont 1996, writ denied) (stating that parent and subsidiary corporations are distinct legal entities and concluding that parent entity could not ignore corporate veil it established between itself and subsidiary to assert workers' compensation immunity held by subsidiary for parent's own benefit).

When an entity insulates itself legally from a related entity, that action is accompanied with legal benefits and potential burdens. One cannot demand differentiation in one context yet benefit from blurred lines in another. *See Pa. Eng'g Corp. v. Islip Res. Recovery Agency*, 710 F.Supp. 456, 465 (E.D.N.Y.1989) (stating

that corporate separateness cannot be ignored "whenever it would be advantageous").

Third, a judicial expansion of immunity to cover acts of subsidiaries may not carry with it a corresponding expansion of legislative waiver of that immunity, leaving a plaintiff injured by a condition or use of tangible personal property without any statutory waiver for this new category of immune defendant. UTP contends that waiver would follow because a wholly-owned subsidiary like UTP "steps into the shoes" of its principal and therefore is able to assert immunity and to have that immunity waived. But the extent to which immunity is waived is dictated by the defined terms of the TCA—which we are required to construe narrowly—not by the judiciary. *Garcia*, 253 S.W.3d at 655; *see* Tex. Gov't Code Ann. § 311.034 (statutes are construed to waive sovereign immunity only if "by clear and unambiguous language").

By statute, the TCA waives a governmental unit's immunity for death proximately caused by the negligence of "an employee acting within his scope of employment" with certain limitations. Tex. Civ. Prac. & Rem. Code Ann. § 101.021(1). "Employee" is defined as a person "who is in the paid service of a governmental unit" and for which the "governmental unit" has the "legal right to control" the details of her work. *Id.* § 101.001(2); *cf. Tex. A & M Univ. v. Bishop*, 156 S.W.3d 580, 584 (Tex.2005) (governmental entity does not waive immunity for acts of independent contractors, only statutory "employees").

 The TCA likewise waives a governmental unit's immunity for death caused by a condition or use of tangible personal property "if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." *Id.* § 101.021(2). "In order to state

a claim under the [TCA] based upon the use or misuse of tangible personal property, a plaintiff must allege that the property was used or misused by a governmental employee acting within the scope of his or her employment." *Harrison v. Univ. of Tex. Health Sci. Ctr. at Houston*, No. 01-12-00980-CV, 2013 WL 4680407, at *3 (Tex.App.–Houston [1st Dist.] Aug. 29, 2013, no pet.) (mem.op.) (citing *Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30, 33 (Tex.1983)). Thus, the misuse provision "predicate[s]" the governmental unit's respondeat superior liability upon the liability of its employee." *DeWitt v. Harris Cty.*, 904 S.W.2d 650, 653 (Tex.1995); *see Eldridge v. Brazoria Cty.*, No. 01-13-00314-CV, 2014 WL 1267055, at *5 (Tex. App.–Houston [1st Dist.] Mar. 27, 2014, no pet.) (mem.op.). "Immunity is not waived when the governmental unit merely 'allow[s] someone else to use the property and nothing more.'" *Dallas Cty. v. Posey*, 290 S.W.3d 869, 871 (Tex.2009) (quoting *San Antonio State Hosp. v. Cowan*, 128 S.W.3d 244, 246 (Tex.2004)).

The Lenoirs seek to hold UTP liable under a respondeat superior theory for its nurse's acts. If the nurse was an "employee" of a "governmental unit"—meaning that the governmental unit had the legal right to control the details of her work and paid her—and she misused property and in doing so caused Shana's death, the "governmental unit" for which she worked arguably has waived immunity under Section 101.021(2). *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2). But UTP is not a governmental unit and, as a result, its nurse-employee cannot fit within the TCA's definition of a "governmental unit" "employee."

UTP asserts that it is irrelevant that the governmental entity in this relationship, UTHSCH, did not control or pay its nurse and we should limit our consideration to

whether UTHSCH had substantial control over its wholly-owned subsidiary, UTP. But looking at the relationships in such a vacuum ignores the implications of UTP's argument. If UTP benefits from judicially recognized, common-law immunity for its employee's acts because it is a wholly-owned subsidiary of a governmental entity, but there is no corresponding waiver of immunity for the employee's acts because UTP does not fall within the TCA's defined term "governmental unit" and the entity that is a "government unit," UTHSCH, did not control the employees' work or pay their salaries, then UTP and any other similarly situated, wholly-owned subsidiaries would exist in a carve out to the TCA that the Legislature has never indicated an intention to create. We cannot agree that UTP's interpretation of immunity law—an interpretation that would lead to such a skewed result—is correct.

### Conclusion

We hold that the Lenoirs did not make a judicial admission that bars them from challenging the grant of UTP's plea to the jurisdiction. We also hold that UTP failed to establish that it is a governmental entity with immunity from suit. Viewing the evidence in the light most favorable to the nonmovants and recognizing that the Legislature expressly reserved to itself the right to add entities to the UT System but did not include UTP in its statutory provisions, we further hold that UTP failed to establish that UTHSCH's immunity from suit extends to it as a creation of UTHSCH, either as an agent or a wholly-owned subsidiary, and we do so in light of the allegations of nursing staff negligence, evidence that UTP had discretion to hire and manage its nursing staff, and the requirement in the UTHSCH and UTP contract that UTP maintain professional liability insurance for its nursing staff.

The trial court erred by granting UTP's plea to the jurisdiction. We reverse the order granting the plea and dismissing the suit against UTP. Because UTP has not established that it is entitled to immunity, we do not reach the issue of whether the Lenoirs adequately pleaded use of personal property to fit within an area of immunity waiver. The case is remanded for further proceedings.